IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BRUCE RICHETTA, et al.            :
             Plaintiffs    :  CIVIL ACTION
        vs.                 :
                       :  NO.  07-cv-3814
STANLEY FASTENING SYSTEMS, L.P.  :
           Defendant    :

**MEMORANDUM OPINION**

GOLDEN, J.                                                AUGUST 21, 2009

This products liability action is brought by Plaintiffs Bruce Richetta and his wife, Melissa Richetta, against Defendant Stanley Fastening Systems, L.P. ("Stanley").  Plaintiffs allege that Defendant is liable for injuries Bruce Richetta ("Richetta") sustained when a nail gun manufactured by Defendant fell off a ladder and discharged a nail into his body.  Plaintiffs are proceeding on a theory of strict liability.[1]  In particular, Plaintiffs contend that the nail gun was defectively designed because it did not have a safety switch or trigger lock and that this defect caused Richetta's injuries.  Plaintiffs are also seeking punitive damages against Defendant.  (Am. Compl. ¶ 33).

Before the Court are two motions for summary judgment, which separately address Plaintiffs' claims for strict liability and punitive damages.  For the following reasons, Defendant's Motion for Summary Judgment seeking judgment as to Plaintiffs' strict liability claim (Doc. No. 45) is denied. Defendant's Motion for Summary Judgment seeking judgment as to Plaintiffs' claim for punitive damages (Doc. No. 35) is granted.

**FACTUAL BACKGROUND**

On September 20, 2005, Plaintiff Bruce Richetta was using a Model N80CB-1 pneumatic nail gun manufactured by Defendant Stanley Fastening Systems, L.P. while working at a construction site.

---

[1] Plaintiffs also initially alleged negligence and breach of warranty counts.  Plaintiffs, however, subsequently withdrew these two counts, instead "electing to proceed only on their Strict Liability claim."  (Doc. No. 60; Pls.' Second Br. at 1).  Accordingly, these two counts will be dismissed without further analysis.

(Def.'s Second Stmt. of Facts ¶ 1).  The nail gun in question was manufactured by Defendant in 2001

and purchased by Richetta in 2002.  (Pls.' First Ex. C, Richetta Dep. at 37; Pls.' First Ex. B, Ponko Dep.

at 22).  After using the nail gun on site, Richetta—with the intention to continue using the nail gun—laid

the gun on top of a six-foot ladder and exited the construction site to retrieve tools.  (Pls.' First Ex. C,

Richetta Dep. at 91-97).  Richetta did not disconnect the air compressor from the nail gun prior to laying

the nail gun on the ladder.  (Id. at 99).  Upon his return to the construction site, Richetta approached the

ladder with screws in one hand and an electric screwdriver in the other hand.  (Id. at 100).  As he

approached the ladder, the nail gun fell off the ladder.  (Id.).  The nail gun was still attached to its air

compressor.  (Id.).  The "contact trip" of the nail gun then made contact with Richetta, making a loud

"bang" sound.  The nail gun discharged a nail into the upper chest/collarbone area of his body.  (Id.).

Richetta does not recall making contact with the ladder or the air hose attached to the air compressor

leading to the nail gun, nor does he remember seeing the nail gun fall from the ladder.  (Id. at 106-07).

Emergency surgery was required to remove the nail from Richetta's chest and subsequent medical

treatment was needed—including open chest surgery, in-patient hospitalization, and follow-up care.

(Am. Compl. ¶ 13).  There were apparently no witnesses to the incident.

       To discharge a nail from a Model N80CB-1 pneumatic nail gun—the nail gun used by

Richetta—the nail gun's trigger mechanism must be pulled simultaneously with the touching of the nail

gun's "contact trip" against a surface.  (Pls.' First Ex. D, Ezra Report at 4-5; Def.'s First Ex. J, Ponko

Aff. ¶ 10).  Plaintiffs do not contend that the gun was defective on the ground that it fired *without* the

pulling of the trigger mechanism.  Rather, Plaintiffs "concede[] that something must have depressed the

trigger" at the time the nail gun's contact trip made contact with Richetta.  (Pls.' First Stmt. of Facts ¶ 4;

Pls.' First Ex. D, Ezra Report at 5).  Plaintiffs' expert opines that Richetta made "a reflexive action to try

and protect himself" that pulled the trigger near the moment the nail gun made contact with Richetta's

chest, causing the nail gun to fire.  (Ezra Dep. at 121-22).

## STANDARD

Summary judgment should be granted if the record, including pleadings, depositions, affidavits, and answers to interrogatories, demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In making that determination, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  The question is whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 251-52.  It is not the role of the trial judge "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial."  Id. at 250.  Indeed, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  Id. at 255.  As Plaintiffs will bear the burden of proof at trial, Defendant may obtain summary judgment by affirmatively demonstrating that Plaintiffs have either no evidence or insufficient evidence to meet their burden at trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

## STRICT LIABILITY

**A.      Restatement (Third) of Torts vs. Restatement (Second) of Torts**

The Court must first determine whether, and to what extent, the Third Circuit Court of Appeals' recent decision in Berrier v. Simplicity Mfg., Inc., 563 F.3d 38 (3d Cir. 2009), applies to the case at bar.[2] The Court concludes that Berrier applies and, as a result, the Court must apply Sections 1 and 2 of the

---

[2] In diversity cases federal courts apply federal procedural and state substantive law.  See Hanna v. Plumer, 380 U.S. 460, 465 (1965).  Pennsylvania's substantive law will therefore apply on the issue of whether Plaintiffs have presented sufficient evidence to establish a claim for strict liability and punitive damages.

Restatement (Third) of Torts to Plaintiffs' strict liability claim under Pennsylvania law.[3]

In Berrier, the Third Circuit predicted that the Pennsylvania Supreme Court "would adopt the

Restatement (Third) of Torts, §§ 1 and 2, thereby affording bystanders a cause of action in strict

liability." Berrier, 563 F.3d at 40.[4]  Until Berrier, strict liability claims in Pennsylvania were examined

under Section 402A of the Restatement (Second) of Torts.  See Berkebile v. Brantly Helicopter Corp.,

337 A.2d 893, 899 (Pa. 1975); see also Restatement (Second) of Torts § 402A (1965).[5]  Thus, the Court

must assess whether Berrier's prediction applies to the facts of the case *sub judice*, thereby rendering

Sections 1 and 2 of the Third Restatement the standard by which Plaintiffs' strict liability claim should

be evaluated.  If Berrier's prediction does not apply to this case, Plaintiffs' strict liability claim must be

evaluated pursuant to Section 402A of the Second Restatement.  The differences between the Third

---

[3] Berrier was decided after Defendant filed its Motion for Summary Judgment.  (Doc. No. 45).  The Court then asked the parties to brief the effect of Berrier on Defendant's Motion for Summary Judgment.  (Doc. No. 75). See Solem v. Stumes, 465 U.S. 638, 642 (1984) ("As a rule, judicial decisions apply 'retroactively.'  Indeed, a legal system based on precedent has a built-in presumption of retroactivity."); Blackwell v. Commonwealth, of Pennsylvania State Ethics Comm'n, 589 A.2d 1094, 1099 (Pa. 1991) ("The general rule followed in Pennsylvania is that we apply the law in effect at the time of the appellate decision."); McHugh v. Litvin, Blumberg, Matusow & Young, 574 A.2d 1040, 1044 (Pa. 1990) ("[D]ecisions announcing changes in the law are applied retroactively, until and unless a court decides to limit the effect of the change, and that litigants have a right to rely on the change, especially if they have a suit pending in our courts at the time the change is announced.").

[4] Section 1 of the Third Restatement states that "[o]ne engaged in the business of selling or otherwise distributing products who sells or distributes a defective product is subject to liability for harm to persons or property caused by the defect."  Restatement (Third) of Torts § 1 (1998).  Section 2(b) of the Third Restatement states that "[a] product . . . is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the alternative design renders the product not reasonably safe."  Id. § 2(b).

[5] Section 402A of the Second Restatement states as follows:
(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
      (a) the seller is engaged in the business of selling such a product, and
      (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
(2) The rule stated in Subsection (1) applies although
      (a) the seller has exercised all possible care in the preparation and sale of his product, and
      (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.
      Restatement (Second) of Torts § 402A (1965).

Restatement and the Second Restatement are significant, as the Third Restatement emphasizes

foreseeable risks of harm while the Second Restatement stresses, among other things, whether the

product was being used as intended by an intended user.  Indeed, in this case, the debate between the

parties under the Second Restatement prior to the Berrier decision focused on whether Richetta used the

nail gun *as intended* at the time of the accident.  (Doc. Nos. 45, 60).[6]

In Berrier, the plaintiff parents of a minor child brought a strict liability action against the

defendant manufacturer of a riding lawn mower after the minor child's grandfather drove defendant's

riding lawn mower in reverse over the minor's leg, causing severe injuries.  Berrier, 563 F.3d at 40-41.

The plaintiffs argued that the lawn mower was defective because it lacked "back-over" protection, such

as a "no mow in reverse" device or roller barriers.  Id. at 41.  The defendant argued—and the district

court agreed—that, under Section 402A of the Second Restatement, "Pennsylvania strict products

liability law does not permit recovery for injuries to anyone other than the intended user."  Id. at 45.  The

district court therefore concluded that, because the minor "was a bystander and not an intended user of

the mower, she could not recover in an action against" the manufacturer.  Id.  The Third Circuit vacated

the district court's decision, holding that the concurring opinion of Pennsylvania Supreme Court Justice

Thomas G. Saylor in Phillips v. Cricket Lighters, 841 A.2d 1000 (Pa. 2003) ("Phillips I"), foreshadowed

Pennsylvania's "adoption of §§ 1 and 2 of the Third Restatement's definition of a cause of action for

---

[6] There are significant differences between the Third and Second Restatements.  By defining "defective in
design" in terms of "foreseeable risks of harm," the Third Restatement—unlike the Second Restatement—"does not
limit a strict liability cause of action to the 'user or consumer,' and broadly permits any person harmed by a defective
product to recover in strict liability."  Berrier, 563 F.3d at 54.  Additionally, by embracing concepts of foreseeability,
the Third Restatement acknowledges that "conceptions borrowed from negligence theory are embedded in strict
products liability doctrine in Pennsylvania."  See id. at 56 (quoting Phillips v. Cricket Lighters, 841 A.2d 1000, 1012
(Pa. 2003) (Saylor, J., concurring)).  However, under the Second Restatement, as one commentator has explained,
strict liability is "limited to situations where a defective product causes an injury while being used as intended by the
intended user, and with only a few exceptions, foreseeability of use, user or harm [is] irrelevant."  James Ronca, Pa.
Products Liability Law: Uncertainty and Silence of the Majority, Legal Intelligencer, July 10, 2009, at 5; see also Pa.
Dep't of Gen. Servs. v. U.S. Mineral Prods., 898 A.2d 590, 600 (Pa. 2006) (applying Second Restatement and
concluding that "a manufacturer can be deemed liable only for harm that occurs in connection with a product's
*intended use* by an intended user; the general rule is that there is no strict liability in Pennsylvania relative to
non-intended uses even where foreseeable by a manufacturer") (emphasis added).

strict products liability." Id. at 53.  In critiquing the Second Restatement's failure to incorporate

negligence concepts, the Third Circuit concluded that "it is difficult (if not impossible) in practice to

determine if a product is safe for an intended use by an intended user without any consideration of

foreseeability." Id. at 56.

In the case at bar, Defendant argues that the Third Restatement's strict liability standard does not

apply to the case at bar because, unlike Berrier, the issue here "is not one of bystander injury . . . but

rather an injury to an *intended user* caused by his conduct." (Def.'s Second Reply Br. at 2).  The Court

disagrees.  First, there is no indication in Berrier that the Third Restatement applies *only* to strict liability

claims where a bystander is involved.  Indeed, the Berrier Court unequivocally predicted that the

Pennsylvania Supreme Court would adopt "§§ 1 and 2 of the Third Restatement's definition of a cause

of action *for strict products liability*." Berrier, 563 F.3d at 53 (emphasis added).  It is difficult to believe

that the Third Circuit in Berrier intended to adopt an inconsistent strict liability standard where the Third

Restatement applies in bystander cases and the Second Restatement applies in all other cases.  In fact,

the Third Circuit in Berrier explicitly rejected similar parsing.[7]  Second, the Third Circuit relied heavily

on Justice Saylor's concurring opinion in Phillips I in predicting that the Pennsylvania Supreme Court

would adopt the Third Restatement. Id.; see Phillips I, 841 A.2d at 1012 (Saylor, J., concurring).[8]  As

the Third Circuit noted, "bystander liability was not an issue" in Phillips I, yet the Berrier Court

nonetheless embraced Justice Saylor's argument that the application of the Third Restatement was

appropriate.  See Berrier, 563 F.3d at 45.  Justice Saylor's comments in Phillips I focused on Section

---

[7] The Berrier Court stated the following: "We think it highly likely that the Justices who would adopt section 2 would adopt as well . . . section 1 rather than trying to parse the applicable provisions of the Third Restatement and thereby supplant some of the provisions of the Second Restatement and not others." Berrier, 563 F.3d at 63.

[8] The Berrier Court went so far as to state that "Justice Saylor was correct in recognizing that '[c]entral conceptions borrowed from negligence theory are embedded in strict products liability doctrine in Pennsylvania.'" See Berrier, 563 F.3d at 56 (quoting Phillips I, 841 A.2d at 1012 (Saylor, J., concurring)).

2(b) of the Third Restatement, which is the Section of the Third Restatement at issue in this case.  See

id. at 60; Phillips I, 841 A.2d at 1019-20 (Saylor, J., concurring).  By relying on a concurring opinion in

a non-bystander case, the Third Circuit must have intended the Third Restatement to apply beyond the

bystander-related facts presented in Berrier.  If the Third Circuit wished to limit the application of the

Third Restatement solely to bystander cases, the Third Circuit would have done so clearly and explicitly.

Thus, it appears that the "bystander" facts in Berrier merely provided an appropriate vehicle for the

Third Circuit to predict that the Third Restatement applies under Pennsylvania law.

    The Pennsylvania Supreme Court's recent refusal to address this issue in Bugosh v. I.U. North

Am., Inc., 971 A.2d 1228 (Pa. 2009) (per curiam), does not change the Court's conclusion that the Third

Restatement applies to the case at bar.[9]  In Bugosh, the Pennsylvania Supreme Court initially agreed to

address the issue of whether the Court "should apply § 2 of the Restatement (Third) of Torts in place of

§ 402A of the Restatement (Second) of Torts."  See Bugosh v. I.U. North Am., Inc., 942 A.2d 897 (Pa.

2008).  However, the Supreme Court subsequently dismissed this appeal "as having been improvidently

granted."  See Bugosh, 971 A.2d at 1229.[10]  The Court's dismissal of the Bugosh appeal can neither be

_____

[9] Bugosh is a non-bystander case that involved the liability of I.U. North America, Inc. ("IUNA"), a
supplier of construction materials whose predecessor purchased products containing asbestos and sold such products
to the public.  See Bugosh v. Allen Refractories Co., 932 A.2d 901 (Pa. Super. Ct. 2007), appeal dismissed, 971
A.2d 1228 (Pa. 2009).  On appeal from a jury verdict in favor of the plaintiff's decedent, who had contracted
malignant mesothelioma from exposure to asbestos-containing products, IUNA argued that the trial court erred in
applying the Restatement (Second) of Torts § 402A instead of the Restatement (Third) of Torts § 2 to assess IUNA's
liability as a supplier rather than as a manufacturer of an asbestos-containing product.  Id. at 910.

[10] Justice Thomas G. Saylor, joined by Chief Justice Ronald D. Castille, dissented from the Pennsylvania
Supreme Court's decision dismissing the Bugosh appeal.  Justice Saylor stated his belief that "the Third
Restatement's provisions are far more reasoned and balanced than [the Second Restatement as adopted in Azzarello
v. Black Bros. Co., 391 A.2d 1020 (Pa. 1978)], and adoption would represent a substantial advancement in
Pennsylvania law."  Bugosh, 971 A.2d at 1241 (Saylor, J., dissenting).  Justice Saylor further stated:

    [T]he Court should no longer say negligence concepts have no place in "strict-liability" doctrine in
    Pennsylvania, when this simply is not accurate in our tort scheme, or in any scheme purporting to recognize
    that manufacturers and distributors are not outright insurers for all harm involving their products.  To the
    degree a distinct category of "strict" product liability doctrine is necessary, at most, it always has been, and
    rationally should be, one of quasi-strict liability, tempered, in design and warning cases, with the legitimate
    involvement of notions of foreseeability and reasonableness within the purview of the fact finder.

deemed a decision on the merits nor an explicit rejection of <u>Berrier</u>.  <u>See, e.g.</u>, <u>Commonwealth v.</u>

<u>Tilghman</u>, 673 A.2d 898, 904 (Pa. 1996) ("[A] dismissal as being *improvidently granted* has the exact

same effect as if this Court had denied the petition for allowance of appeal (allocatur) in the first place.

Where we dismiss an appeal as *improvidently granted*, the lower tribunal's opinion and order stand as a

decision of that court and this Court's order has *no* precedential value.").  As <u>Bugosh</u> was a procedural

decision on the appropriateness of the appeal, the Court cannot infer that <u>Berrier</u>'s prediction that a

majority of the Justices of the Pennsylvania Supreme Court would adopt the Third Restatement is now

invalid.  The true reasoning behind the Pennsylvania Supreme Court's decision in <u>Bugosh</u> cannot be

known, and this Court will not engage in speculation.  The Pennsylvania Supreme Court may ultimately

embrace the Third Restatement and, in the absence of such a definitive holding, the Third Circuit's

adoption of the Third Restatement in <u>Berrier</u> applies to this case.

For the foregoing reasons, Defendant's Motion for Summary Judgment seeking judgment as to

Plaintiffs' strict liability cause of action will be examined based on the principles articulated in the Third

Restatement.  <u>See</u> <u>Martinez v. Skirmish, U.S.A., Inc.</u>, No. 07-5003, 2009 WL 1437624, at *3 (E.D. Pa.

May 21, 2009) (applying Third Restatement in non-bystander strict liability case).

**B.     Application of Restatement (Third) of Torts**

Under Section 1 of the Third Restatement, "[o]ne engaged in the business of selling or otherwise

distributing products who sells or distributes *a defective product* is subject to liability for harm to

persons or property *caused by the defect*."  <u>Berrier</u>, 563 F.3d at 54 (quoting Restatement (Third) of Torts

§ 1 (1998)) (emphasis added).

**1.     Design Defect**

Section 2 of the Third Restatement states that a product is defective when, at the time of sale or

---

<u>Id.</u> at 1240 (Saylor, J., dissenting).

distribution, the product is, among other things, "defective in design."  Id. (quoting Restatement (Third)

of Torts § 2 (1998)).  A product is defective in design when "the foreseeable risks of harm posed by the

product could have been reduced or avoided by the adoption of a reasonable alternative design by the

seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of

the alternative design renders the product not reasonably safe."  Id. (quoting Restatement (Third) of

Torts § 2(b) (1998)).

Plaintiffs contend that the nail gun is defective in design under Section 2(b) of the Third

Restatement because it lacks a safety switch or trigger lock.  (Pls.' Second Sur-reply Br. at 2).

Defendant disagrees and argues that a reasonable jury could not find the nail gun defective.  (Def.'s

Second Reply Br. at 2).  The Court holds that Plaintiffs have produced sufficient evidence from which a

reasonable jury could conclude that, under Section 2(b) of the Third Restatement, the nail gun is

defectively designed because it lacks a safety switch or trigger lock device.[11]

### a.     Foreseeable Risks of Harm

Plaintiffs have presented sufficient evidence for a reasonable jury to conclude that there is a

foreseeable risk of inadvertent firings when Defendant's Model N80CB-1 nail guns are left unattended

but are still plugged into their respective air compressors.  The evidence indicates that a construction

worker like Richetta often does not disconnect his nail gun from its air compressor when he intends to

continue using the nail gun.  Plaintiffs' expert, Mark Ezra, P.E. ("Ezra"), indicates that "[i]t is not

uncommon for construction workers, while performing repetitive work that requires more than one type

---

[11] Plaintiffs also initially argued that the nail gun at issue was defectively designed because it was fitted with a "contact trip trigger" rather than a "sequential trip trigger."  (Pls.' First Br. at 6).  In their Memorandum of Law in Opposition to Defendant's Motion in Limine to Preclude Plaintiffs From Introducing Certain Testimony from their Expert, Mark Ezra, P.E., Plaintiffs stated that "they do not intend to move forward with their claim that the nail gun in question was defective because it contained a Contact Trip Trigger rather than a Sequential Trip Trigger."  (Doc. No. 63 at 1).  Accordingly, the Court will not address whether a jury could conclude that the nail gun was defective in design based on Defendant's decision to not fit the nail gun with a sequential trip trigger mechanism.

of hand tool and/or a power tool for the task, to put down their power tool for a short period of time and leave it connected to its power source." (Pls.' First Ex. D, Ezra Report at 6). Ezra further states that "[t]he intent is then to pick up the power tool for a short period of time and leave it connected to its power source." (Id.). Richetta also explains that "it is common for workers to walk around the worksite carrying nail guns connected to the air compressor, climb ladders and scaffolding with connected nail guns and to leave the nail guns connected and lay them on top of ladders, on scaffolds, on roofs or on the ground or floor." (Pls.' Second Ex. H, Richetta Aff. ¶ 6). Richetta continues: "If nail guns were disconnected, workers would lose time retrieving the air hose and reconnecting it back to the nail gun." (Id.). Furthermore, an engineer formerly employed by Defendant, Robert Olmstead, testified at his deposition that it is not uncommon for workers to leave their nail gun connected to their respective air compressors while other tasks are being performed. (Pls.' First Ex. G, Olmstead Dep. at 16-17). Coupled with this foreseeable use of Defendant's product, Plaintiffs have presented evidence of numerous accidents involving nail gun misfirings. (See, e.g., Pls.' First Br. at 7; Pls.' First Exs. H, I, J, K).

    b.  **Reasonable Alternative Design**

  Additionally, Plaintiffs have presented sufficient evidence for a jury to conclude that a reasonable alternative design, i.e., a trigger lock or safety switch, would prevent the risk of inadvertent firings and injuries. The Comments to the Third Restatement elaborate that, "[i]f such a design could have been practically adopted at the time of sale if the omission of such a design rendered the product not reasonably safe, the plaintiff establishes a defect under Subsection (b)." Restatement (Third) of Torts § 2 cmt. d (1998). "If the plaintiff introduces expert testimony to establish that a reasonable alternative design could practically have been adopted, a trier of fact may conclude that the product was defective notwithstanding that such a design was not adopted by any manufacturer, or even considered for

commercial use, at the time of sale."  Id.

Here, Plaintiffs' expert, Mark Ezra, opines that "[t]he cost of a trigger lock mechanism, allowing

the nail gun trigger mechanism to be easily locked in a safe position so that the nail gun could be put

down safely by a worker without having to disconnect the air line to the nail gun, is inconsequential."

(Pls.' First Ex. D, Ezra Report at 9).  Further, Matthew Ponko, an engineer employed by Defendant,

testified that it was economically and practically feasible for the nail gun used by Richetta to be

redesigned to include an on/off or safety switch that would disable the nail gun from firing even though

it was plugged in to the air compressor.  (Pls.' First Ex. B, Ponko Dep. at 51-52).  Robert Olmstead, an

engineer formerly employed by Defendant, also testified that it would have been feasible from an

engineering standpoint to design and manufacture a gun with an on/off or safety switch that would lock

the nail gun's trigger.  (Pls.' First Ex. G, Olmstead Dep. at 18-19).  Thus, a factfinder could conclude

that a reasonable alternative design would have prevented the risk of inadvertent firings and injuries.

c.    **Safety in Absence of Alternative Design**

The Court also holds that a reasonable jury could conclude that the nail gun used by Richetta is

not reasonably safe in the absence of a safety switch or trigger lock.  Defendant argues that the actual

design of the nail gun is safe in the absence of a trigger lock because it provides "the equivalent and

indeed, superior type of safety function because the act of unplugging the tool from the air hose while it

is not in use or *unattended* deactivates the nailer, making it impossible to discharge a nail."  (Def.'s

Second Reply Br. at 3).  This feature is emphasized in warnings accompanying the nail gun, which

inform the user that the nail gun should be disconnected from the air compressor when not in use.  One

warning in the manual states that a user of the nail gun should "[n]ever leave a tool unattended with the

air attached."  (Def.'s First Ex. D at 8).  Another warning on the tool states that an operator of the nail

gun should "[d]isconnect [the] tool from [the] air [compressor] when clearing a jam, servicing or when

-11-

[the] tool [is] not in use." (Def.'s Second Stmt. of Facts ¶ 11).  Defendant further contends that the

safety superiority of simply unplugging the tool "has been conclusively proven" by Plaintiffs' expert,

Mark Ezra, who testified that, had Richetta disconnected the nail gun from the air compressor pursuant

to the aforementioned warnings, the accident would not have occurred.  (Def.'s Second Reply Br. at 4;

Def.'s Second Ex. D, Ezra Dep. at 119).

    First, the Court disagrees with Defendant's contention that Ezra's testimony conclusively

renders, as a matter of law, the product reasonably safe.  As noted above, Plaintiffs' expert has opined in

numerous instances that the nail gun's absence of a safety switch mechanism—despite a user's ability to

disconnect the air compressor from the nail gun—renders the nail gun unreasonably dangerous because

the nail gun's design disregards its foreseeable use by lacking the ability to be left in a state where the

nail gun is ready for immediate reuse without the need to reconnect the nail gun to its air supply.  (Pls.'

First Ex. D, Ezra Report at 8).  In fact, Plaintiffs' expert specifically notes that a safety switch allows a

user to safely place the nail gun down on a hard surface "without the inconvenience of disconnecting the

air line supplying power to the nail gun."  (Id.).  These assertions—coupled with Plaintiffs' proffered

evidence that it is common (and therefore foreseeable) for construction workers to briefly set aside nail

guns while the nail guns are still connected to their respective air compressors—at the very least create a

factual question as to whether the nail gun used by Richetta is reasonably safe in the absence of a trigger

lock or safety switch.  See Ryle v. NES Rentals, No. 04-2800, 2006 WL 931862, at *3 (M.D. Pa. Apr.

11, 2006) (rejecting defendant's argument that "a product supplied with instructions that, if followed,

make it safe for use, may not be found to be defective and unreasonably dangerous").

    Second, Defendant's argument that the nail gun is safe as a matter of law overemphasizes the

effect of the warnings accompanying the nail gun.[12]  Under the Third Restatement, "[a] broad range of

---

[12]  Comment j of Section 402A of the Second Restatement provides that, "[w]here a warning is given, the

factors may be considered in determining whether an alternative design is reasonable and whether its

omission renders a product not reasonably safe." Restatement (Third) of Torts § 2 cmt. f (1998). These

factors include "the magnitude and probability of the foreseeable risks of harm, *the instructions and*

*warnings accompanying the product*, and the nature and strength of consumer expectations regarding the

product, including expectations arising from product portrayal and marketing." Id. (emphasis added).

Thus, while the warnings accompanying the nail gun (to the extent they are admissible) may be

persuasive to a jury in an analysis of these factors, such warnings are not dispositive. Plaintiffs are

bringing their strict liability claim pursuant to Section 2(b) of the Third Restatement, not Section 2(c)

which addresses whether a product is defective based on inadequate instructions or warnings. The Third

Restatement is clear that "[t]he fact that adequate warning was given does not preclude [a plaintiff] from

seeking to establish a design defect under Subsection (b)." See id. § 2 cmt. l, illus. 14 (1998). Put

another way, "when a safer design can reasonably be implemented and risks can reasonably be designed

out of a product, adoption of the safer design is required over a warning that leaves a significant

residuum of such risks." Id. § 2 cmt. l. (stating also that "[w]arnings are not . . . a substitute for the

provision of a reasonably safe design").

The case at bar, based on the evidence presented to the Court thus far, is apparently not one

where "an alternative design to avoid risks cannot reasonably be implemented," which would normally

make adequate instructions and warnings sufficient to render the product reasonably safe. See id.

Further, the Third Restatement indicates that, in addition to warnings, "the magnitude and probability of

---

seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for
use if it is followed, is not in defective condition, *nor is it unreasonably dangerous*." See Restatement (Second) of
Torts § 402A cmt. j (1965) (emphasis added). Understandably, Defendant relies heavily on this Comment in the
Second Restatement in making the argument that Richetta had an obligation to comply with the warnings
accompanying the nail gun. (Def.'s Second Br. at 6). However, there has been "heavy criticism [of Comment j]
from a host of commentators, see Uniroyal Goodrich Tire Co. v. Martinez, 977 S.W.2d 328, 336 (Tex. 1998), and
this principle was dropped from the Third Restatement. See Ryle, 2006 WL 931862, at *3 n.2.

the foreseeable risks of harm" are also factors in determining whether the omission of an alternative

design renders a product not reasonably safe.  Id. § 2 cmt. f.  As demonstrated above, Plaintiffs have

produced expert testimony indicating that there was a foreseeable risk of harm that Defendant's nail

guns would inadvertently fire in light of how these guns are routinely used by construction workers.  As

Justice Saylor himself noted, such considerations "are best assessed by a factfinder in a risk-utility

equation."  See Phillips I, 841 A.2d at 1023 (Saylor, J., concurring); see also Uniroyal Goodrich Tire Co.

v. Martinez, 977 S.W.2d 328, 337 (Tex. 1998), cert. denied, 526 U.S. 1040 (1999).

> ### 2.      Causation

Defendant also contends that Plaintiffs' strict liability claim should be dismissed because

Plaintiffs have failed to establish that the alleged safety lock defect caused Richetta's injuries.  (Def.'s

Second Reply Br. at 6).  Defendant claims that it was Richetta's failure "to unplug the nailer from the air

hose before leaving the work area that ultimately caused his alleged injury."  (Id.).  Defendant cites the

testimony of Plaintiffs' expert, Mark Ezra, who acknowledged at his deposition that the accident would

not have occurred had Richetta disconnected the nail gun from the air compressor pursuant to warnings

accompanying the nail gun.  (Def.'s Second Ex. D, Ezra Dep. at 119).  Defendant further argues that,

even if the nailer was defective because it did not have a safety lock, "the causation chain of events

would have been severed had [Plaintiff] simply followed the directions provided by [Defendant]."

(Def.'s Second Br. at 8).  Therefore, according to Defendant, the alleged design defect could not have

caused Richetta's injuries as a matter of law.  (Id.).  The Court disagrees.

Again, under the Third Restatement, the defect in a particular product must cause harm to the

plaintiff for strict liability to apply.  See Restatement (Third) of Torts § 1 (1998).  A plaintiff needs "to

prove that the defect was a proximate cause of the plaintiff's injuries."  Berkebile, 337 A.2d at 899; see

also Wilson v. Vermont Castings, Inc., 170 F.3d 391, 396 (3d Cir. 1999).  To satisfy the proximate cause

requirement, a plaintiff must prove that the product's defect "was a substantial factor in causing the injury." Barnes v. Am. Tobacco Co., 161 F.3d 127, 148 (3d Cir. 1998), cert. denied, 526 U.S. 1114 (1999). A plaintiff's "negligent conduct is not relevant if the product defect contributed in any way to the harm." See Jara v. Rexworks, Inc., 718 A.2d 788, 793-94 (Pa. Super. Ct. 1998), appeal denied, 737 A.2d 743 (Pa. 1999); Kimco Dev. Corp. v. Michael D's Carpet Outlets, 637 A.2d 603, 607 (Pa. Super. Ct. 1993) (holding that a defendant may not assert comparative negligence in a strict products liability action). However, "where the defense offers evidence to show that the accident occurred *solely* as a result of the plaintiff's conduct, the plaintiff's actions are relevant and admissible to prove causation." See Fralish v. A.O. Smith Corp., No. 1333 MDA 2002, 2004 WL 1587559, at *8 (Pa. Super. Ct. July 7, 2004), appeal denied, 871 A.2d 191 (Pa. 2005).

Plaintiffs have presented enough evidence for a reasonable jury to conclude that the nail gun's lack of a safety lock was a substantial factor in causing Richetta's injuries. Defendant's theory is apparently that the harm inflicted on Richetta was solely attributable to a supervening cause—namely Richetta's failure to disconnect the nail gun from its air compressor. (Def.'s Second Br. at 7). However, Plaintiffs have presented evidence through their expert that—notwithstanding Richetta's decision not to disconnect the nail gun from its air compressor—had the nail gun been equipped with a safety lock or trigger switch, Richetta would have been able to avail himself of such a mechanism. (Pls.' First Ex. D, Ezra Report at 8). This mechanism, according to Plaintiffs' expert, would have prevented a nail from firing while temporarily not in use. (Id.). Thus, it cannot be conclusively said at this juncture that the accident was solely a result of Richetta's conduct and not related in any way to the alleged defect in the nail gun. See Jara, 718 A.2d at 793-94 (noting that, where the plaintiff fell from a conveyor belt manufactured by the defendant after a co-worker activated the conveyor belt, the plaintiff would have had warning or been provided a safe location once the belt was activated had the conveyor belt in

question not been defective; accordingly, "it could not be established that the accident was solely a result

of [the plaintiff's] or another's conduct").  Indeed, as the Pennsylvania Superior Court has explained,

"even where the accident is not specifically attributable to the product defect, the harm caused by that

defect concomitant with the accident can result in liability of the manufacturer of the defective product

to the injured person."  See Clark v. Bil-Jax, Inc., 763 A.2d 920, 924 (Pa. Super. Ct. 2000), appeal

denied, 782 A.2d 541 (Pa. 2001); see also Donald v. Shinn Fu Co. of Am., No. 99-6397, 2002 WL

32068351, at *6-7 (E.D.N.Y. Sept. 4, 2002) (noting, under New York law, that the "substantial factor"

test assumes that more than one action can cause an accident, and stating that a showing by a defendant

that the plaintiff's conduct was the sole proximate cause of his or her injuries "is difficult on a motion

for summary judgment").  This is not a case where the Court should dismiss the Third Circuit's

pronouncement that "the question of whether [the plaintiff's] own conduct caused his injury should

generally be left to the jury, if such a question is presented to the jury at all."  See Pineda v. Ford Motor

Co., 520 F.3d 237, 241 n.5 (3d Cir. 2008) (design defect case); see also Donald, 2002 WL 32068351, at

*6 ("Usually, whether or not a defect was indeed a substantial factor is a matter for the trier of fact to

decide.").  Simply stated, the question of causation is best left for a jury.[13]

## PUNITIVE DAMAGES

The Court must next determine whether a reasonable jury could hold Defendant liable for

punitive damages under Plaintiffs' strict liability cause of action.  The Court concludes that a reasonable

jury could not reach this conclusion.

Plaintiffs' basis for punitive damages is that Defendant had actual knowledge of inadvertent

---

[13] Because Plaintiffs have presented sufficient evidence for a reasonable jury to hold Defendant strictly liable, Plaintiff Melissa Richetta's loss of consortium claim also survives summary judgment.  See Schrim v. Campbell Soup Co., No. 05-1496, 2007 WL 2345288 (W.D. Pa. Aug. 16, 2007) ("Under Pennsylvania law, [husband's] claim for loss of consortium . . . is derivative of [wife's] strict liability failure-to-warn claims against defendants.").

firings of its nail guns as evidenced by prior lawsuits and complaints, and yet continued to produce nail guns without safety locks. These safety locks, according to Plaintiffs, would have enabled the user to disable the nail gun while it was plugged into the power source. (Am. Compl. ¶ 33; Pls.' First. Br. at 7-9, 16; Pls.' First Ex. D, Ezra Report at 8-9; Pls.' First Exs. H, I, E. at 10). Plaintiffs specifically contend that, despite this actual knowledge of the danger, Defendant made a deliberate decision to continue selling nail guns, including the one sold to Richetta, without a trigger lock. (Pls.' First. Br. at 16). Plaintiffs further argue that Defendant's conscious appreciation of this risk is clear in the 1974 patent owned by Defendant which, albeit by implication, acknowledges the dangers of the contact trip trigger design. (Pls.' First Ex. E at 10-11).[14] Plaintiffs add that a safety switch could have been added at low cost and Defendant's failure to do so constituted reckless indifference. (Pls.' First. Br. at 17).

In Pennsylvania, punitive damages may be awarded for outrageous conduct constituting either an evil motive or reckless indifference to the rights of others. Feld v. Merriam, 485 A.2d 742, 747-48 (Pa. 1984) (quoting Restatement (Second) of Torts § 908(2) (1977)). In particular, "[p]unitive damages must be based on conduct which is malicious, wanton, reckless, willful, or oppressive." Id. (internal quotations omitted). As Plaintiffs do not appear to argue that Defendant had an evil motive, the Court will assess whether Defendant was recklessly indifferent to the rights of others. In defining "reckless indifference," Pennsylvania courts have noted that "an appreciation of the risk [of harm] is a necessary element of the mental state required for the imposition of [punitive] damages." Hutchinson v. Luddy, 870 A.2d 766, 771-72 (Pa. 2005) (quoting Martin v. Johns-Manville Corp., 494 A.2d 1088, 1097 n.12 (Pa. 1985) (plurality opinion)). In other words, a defendant acts with reckless indifference when he knows, or has reason to know, of facts which create a high degree of risk of physical harm to another,

---

[14] The 1974 patent describes common instances of inadvertent nail gun actuation and notes that "[i]t is generally recognized that the chances of inadvertent actuation present in concomitant actuating mechanisms can be reduced by providing an actuating mechanism which requires the operator to sequentially move the first contact trip and then the trigger to accomplish actuation." (Pls.' First Ex. E at 10).

and deliberately proceeds to act, or to fail to act, in conscious disregard of, or indifference to, that risk.

Id. at 771.  The Pennsylvania Supreme Court, however, has made it clear that "punitive damages are an

'extreme remedy' available in only the most exceptional matters."  See Phillips v. Cricket Lighters, 883

A.2d 439, 445 (Pa. 2005) ("Phillips II").  "Ordinary negligence, involving inadvertence, mistake or error

of judgment will not support an award of punitive damages."  Hutchinson v. Penske Truck Leasing Co.,

876 A.2d 978, 983-84 (Pa. Super. Ct. 2005), aff'd, 922 A.2d 890 (Pa. 2007).

     The Court has also examined closely the Pennsylvania Supreme Court's decision in Phillips

II—a decision that has been briefed extensively by the parties in which the Pennsylvania Supreme Court

concluded that punitive damages were inappropriate.  In Phillips II, a two-year-old child started a fire

while playing with a disposable butane lighter, killing himself, his mother, and another minor child.  See

Phillips II, 883 A.2d at 442.  The administratrix of the estates of these decedents brought a products

liability action against the defendant manufacturers and distributors of the disposable butane lighters on

the ground that the lighter at issue was defective because it should have had child-resistant features.  Id.

In support of punitive damages, the administratrix presented evidence that the defendant manufacturer

had notice of prior instances in which its disposable butane lighters were used by children to accidentally

cause fatal fires.  Id. at 446-47.  The administratrix presented evidence showing that fires caused by

children playing with butane lighters resulted in the deaths of 120 people per year, with an additional

750 people being injured in these fires.  Id. at 446.  Property damage from these fires was in the range of

$300 to $375 million per year.  The administratrix also proffered evidence that the defendant

manufacturer decided not to produce a lighter with a child-proof design after discovering during test

marketing that its adult customers disliked the lighter with child-resistant features.  Id.  The Court,

however, concluded that the defendant manufacturer's knowledge of these prior accidental fires, along

with the defendant's strategic choice based on consumer desires not to create a child-proof lighter, did

not exhibit reckless indifference sufficient for a reasonable jury to impose punitive damages. <u>Id.</u> at 447.

Here, the only basis for Plaintiffs' punitive damages claim is that Defendant had notice of injuries resulting from its nail guns' contact trip trigger design, yet Defendant did not redesign its nail guns to include a safety switch. As in <u>Phillips II</u>, assuming that the prior incidents of nail gun misfirings are similar to the incident in this case, notice of these incidents coupled with Defendant's decision not to modify the nail gun's design are, by themselves, insufficient to show that Defendant had knowledge of facts that created a high degree of risk of physical harm to another, yet deliberately proceeded to act in conscious disregard of that risk.

Defendant's decision to package the nail gun at issue with warnings stating that the nail gun should be disconnected from the air compressor when not in use is also a factor in the Court's decision to strike Plaintiffs' punitive damages claim. Notwithstanding Richetta's acknowledgment at his deposition that he read the manual and understood the warnings contained therein, (<u>see</u> Pls.' First Ex. C, Richetta Dep. at 159), Plaintiffs contend that these warnings do not negate Defendant's recklessly indifferent conduct because Richetta's use of the nail gun without disconnecting the air compressor was foreseeable. Again, Plaintiffs' expert notes that "[i]t is not uncommon for construction workers . . . to put down [a] power tool for a short period of time and leave it connected to its power source." (Pls.' First Br. at 10; Pls.' First Ex. D, Ezra Report at 6). However, the existence of this warning language substantially undercuts Plaintiffs' argument and indicates that Defendant was, if anything, attempting to minimize the risk of accidents through this warning language. As "[t]he state of mind of the actor is vital" in determining whether punitive damages are appropriate, <u>see Feld</u>, 485 A.2d at 748, this conduct cannot be considered recklessly indifferent. <u>See also Goncalves v. Eagle-Picher Indus., Inc.</u>, 610 F. Supp. 61, 67 (E.D. Pa. 1985) (applying New Jersey punitive damages law and stating that "evidence of defendant's knowledge after warnings are used ordinarily goes to the adequacy of the warnings and not

to punitive damages") (citing <u>Gill v. Pacor, Inc.</u>, 24 Pa. D. & C. 3d 659, 679 (Phila. County Ct. Com. Pl. 1982)).

The mere possibility of establishing liability alone cannot justify the imposition of punitive damages.  As one court has noted, that Defendant's "efforts did not prevent all injuries is not the issue." <u>See</u> <u>Drabik v. Stanley-Bostitch, Inc.</u>, 997 F.2d 496, 510 (8th Cir. 1993).  Rather, "[t]he point is that these actions belie an outrageous, wanton disregard for user safety which would support a punitive damages award."  <u>Id.</u> (holding that, under Missouri law, punitive damages were inappropriate against defendant nail gun manufacturer because, once the defendant became aware of inadvertent firings, the defendant altered the handle design, introduced a sequential trip mechanism, and included warnings in the operation manual and on the nailer itself).  Plaintiffs have not satisfied this standard.[15]

An appropriate Order will be docketed.

---

[15] Defendant has also filed a Motion *in Limine* requesting that the Court try liability and compensatory damages issues separately from the issue of punitive damages.  (Doc. No. 47).  Because there is no triable issue of fact on the question of punitive damages, Defendant's Motion *in Limine* for Bifurcation is denied as moot.  Therefore, the Court will omit any further analysis on this Motion *in Limine*.